Case number 253770, Juanita Gowdy v. University Hospitals Cleveland Medical Center et al. Argument not to exceed 15 minutes per side. Mr. Patakos, you may proceed for the appellant. Good morning. Good morning. It is an honor to be here. I thank the court for hearing our appeal this morning. My client and I both do. I would like to reserve five minutes of my time for rebuttal and, if I may, take the first ten seconds or so here, since these proceedings are being recorded for posterity and I am so far away from home, to wish my wife a happy tenth anniversary today. Thank you. That's a first. Happy birthday. Thank you. So, in this case, which is essentially a First Amendment retaliation case under 42 U.S.C. 1983, the trial court dismissed all seven of the causes of action alleged in a sweeping order where the trial court essentially usurped the trier of facts function. And I submit first, and I'd like to emphasize this morning, that the simplest aspect of this appeal, where the need for reversal is the clearest, is with respect to the trial court's dismissal of Count 1, which is the First Amendment retaliation claim that is based on our allegations that a person of ordinary firmness would have their First Amendment rights chilled if what happened to Juanita Gowdy would happen to them. Let's start there and let's continue the theme of talking about clearly established law. This is a really interesting claim, I think. First Amendment right not to be retaliated against by separating from a support person or another relative. And I'm just wondering, is there clearly established law that would say that what these officers did somehow violated the Constitution? So, in the context of a First Amendment retaliation claim, the qualified immunity analysis is relatively simple. And it is just that a reasonable officer knows that they can't take adverse action against someone because of their speech. It doesn't matter what the pretext for the adverse action is. It's very clear, the facts are essentially not in dispute in this case, that Ms. Gowdy and her daughter were at the hospital there on a holiday weekend for hours seeking emergency medical attention. And they saw a very traumatizing event. Let me just stop you, Counselor, because I don't think you answered my question. I understand the principle not retaliating against somebody because of their speech. Is there a case that you can point to that shows that what these officers did in these circumstances, of course, Judge Sutton was saying, doesn't have to be the same day of the week or anything like that, that would give some shape to the right that they were violating? Well, I mean, I can point to a lot of cases. I can point to Wood v. . . Maybe what's the best one? What's kind of the most like this? Well, I mean, again, there's a lot. And these cases are very diverse in their facts. And this Court never gets into this sort of second level of how are the defendants justifying their adverse treatment. So you look at Wood v. . . Eubanks, which cites numerous cases. Mitchell v. . . Vanderbilt University. Burlington v.  Santa Fe. Withholding an educational transcript from a student. Issuing a stop work order. Overtightening a detainee's handcuffs. Westmoreland v. . .  Issuing discipline against a firefighter. The question is whether these adverse actions were taken because of the speech. So the qualified immunity analysis in these cases is simple. It's every officer knows that they can't turn up the . . . Do you not look at all as to the facts of what are happening? Well, what you have to look at, the elements . . . The argument is that King is raising such eruption that they don't want to let her get into the hospital. Now, do we say that we can't look at the facts of that at all? Or that your position is that it's a genuine dispute of material fact whether she was quiet as a mouse? Well, that's a good question. And it does get into issues of fact. But what is alleged and frankly what is clearly shown on the video, which I know is another interesting issue here . . . Because I'm like, can we watch the video in here? It's very . . . It's actually an interesting issue. But in many ways, or I think largely the video really doesn't matter because what is indisputably on that video . . . And what is alleged in our complaint, which must be construed in the plaintiff's favor on this appeal and at the pleadings phase . . . Is that Ms. King did not start becoming turbulent until after the officers had denied her re-entry to the hospital. So, they were arguing and Ms. Gowdy even says this ain't 1963. They see the officers deny a gunshot wound victim's father entry into the hospital. There were many people nearby that were upset about this. Ms. Gowdy and Ms. King were just two of many bystanders that said, how can you treat this poor father this way? So, it was emotional. People are being human there. And Ms. Gowdy was at the hospital with her daughter for hours that day. Just as any one of us would want to be accompanied by someone we love, particularly our daughter if we're a relatively elderly person. So, they were there all day. Ms. Gowdy and Ms. King clearly had a right to be there. And then all of a sudden after they engage with these officers . . . And every bit of this engagement was First Amendment protected speech. The trial court even admits that in the order. But that's when the officers decide, okay ma'am, after stopping them and essentially harassing them at the door instead of just letting them go back in . . . They knew, and the video shows and we allege, that they knew that Ms. Gowdy was a patient at the hospital who was there receiving care. She clearly had her armband on. And you can even hear them say, they're together. They knew that Paris was there with Juanita. So . . . I also concede counsel that the officers told Ms. Gowdy that non-patients cannot enter. They only . . . Go ahead. They only . . . That was only after they had engaged in this argument about the way the officers were treating this man. And that was only after Ms. Gowdy said, this ain't 1963. It was only after Ms. Gowdy said . . . Counsel, it was before the detention and the arrest that are part of your argument on counts. I'm sorry, what was before that? Telling Ms. Gowdy and Ms. King that you cannot come in unless you're a patient. Right. And that's what we're alleging is fundamental retaliation. Because she was allowed in there for hours that day. Ms. King had gone in and out of the hospital that day. And it was only after the argument, they're like, all right, now we're not letting you in. Hold on. Your theory is that telling them the policy, in effect, the soft lockdown policy, was itself retaliatory? Your Honor, we're saying that policy doesn't exist. I tried this case in the trial court. There was no evidence of a soft lockdown policy other than their say-so. They couldn't produce a single document. And as we allege in the complaint, and as is clearly depicted in the video, they were letting other people go in. A guy shows up and he's like, my girl's in there. They don't ask him who he is. They don't ask him to look at his ID. They don't ask him for a bracelet. Contrast to Ms. Gowdy and Ms. King who were there for hours that day. Ms. King, Ms. Gowdy's daughter, had gone in and out to have cigarette breaks. And then all of a sudden, after the argument, they're not going to let Ms. King back in. It's traumatizing. Maybe just slow your speech down and lower the volume a little. It will just help us hear you. I'm sorry. Usually there's a best done as a conversation. So let's just try to make it a conversation. So we've seen the film. And I'm just curious what you would say if you focus on the key parts of the encounter. When did the officers make the mistake? It seems like they're allowed to make sure she's a patient. They do learn she's a patient. And it's true. So is that the mistake right there, that as soon as she showed this, they should have just, everything should have stopped and let her right in? Your Honor, the mistake, and I would call it more than a mistake. No, no, constitutional violation. Yeah, fine, fine.  Was when they knew at all relevant times that Paris King and Juanita Gowdy were family members, one of whom was there to receive care. And their violation was when they arbitrarily and for retaliatory reasons decided, all right, well, you can't go in with your mom. Ms. Gowdy, you're not entitled to have your daughter with you anymore because you got too lippy with us. That's what happened here. And that is a clear, fundamental First Amendment retaliation claim. I mean, the elements of this of this claim are established here in spades and the trial court just didn't address the claim. All right. That's what you get. You're you. I think you wanted five full minutes. You'll get your full five minutes and we'll hear from the other. Thank you. I just want to emphasize I have 18. If I may. Yeah. Just briefly. This is a hospital. This is people getting emergency care. There's a whole federal statutory scheme and Tala that prohibits hospitals from prohibiting people from even discouraging people from getting emergency care. They can't even hospitals can't even post wait times on emergency rooms. So if hospitals are allowed to have their police officers treat people like this, I mean, it's just I think the hospital context is especially relevant here to show the merits of the claim. And so the officers aren't in aren't entitled to to try to not have the hospital be a scene of turbulence. Well, again, your honor, there was the only turbulence was caused after the retaliation. I mean, they're of course, just like you're entitled to say after the police, you're entitled to argue with the police. My clients didn't say anything. That really goes to your no soft lockdown policy at all that, you know, when when gunshot victims have been brought in, you don't want other other folks coming in. You want to keep the scene under control. And you're saying that that really wasn't relevant here. I wouldn't say that, your honor. I wouldn't say I'm going that far. What I'm saying is they're using this soft lockdown as a pretext for why they didn't let King and Gowdy in when they already knew that King and Gowdy had been there that day for a long period of time. It's one thing to say, I'm not going to let new people in to follow. So by not letting her in, that goes even to the wristband asking that they shouldn't have asked King Gowdy for her wristband because they knew she was a patient. I'm not saying that. That's where that's where it really starts, because she won't present it for a while. I actually specifically and carefully alleged in the complaint and have argued, including before this court, that, you know, it's maybe dubious for them to have stopped Gowdy, even though they knew she was a patient, which we do claim that they did. It was really the not letting her daughter come in that really crystallizes the claim. Thank you. Thank you. All right. Mr. Ruttinger, are you going first? OK. Good morning. Good morning, Your Honor. May it please the court. The officer's body camera footage here blatantly contradicts the First Amendment retaliation claims, and that's what disposes of this case, Your Honor. Let's talk a little bit about what the video actually shows. First off, Mr. Patakos today has focused on alleging that the real core of this case is the decision not to let Miss Gowdy's daughter, Paris King, enter the hospital. The video contradicts any allegation that that is retaliation for Miss King's speech. Why do you say that? Two pieces, Your Honor. First, there is already a content-neutral explanation for what's going on on the video itself, when at the start of it, the gunshot wound victim's father shows and is told they're not letting visitors in at that time. So we already have one instance there. It wouldn't have made any sense for officers to retaliate against Miss King's or Miss Gowdy's speech by beginning with denying entry to that father. But let's talk a little bit about the soft lockdown. Does the father eventually get in? It's not shown on the record, Your Honor. My assumption is that eventually he does, but that's not within the record before us. Why isn't the father like a daughter in the sense of going in? I don't think there's a material difference between the two, but that's because – let's talk a little bit about the soft lockdown because that explains it. Mr. Patakos is right. There is no written policy on the soft lockdown. That's because it embodies the need for officer discretion to control the scene after the arrival of a gunshot wound victim. The city of Cleveland attached the criminal transcript here, which all this testimony occurred to its answer on the case. If this court delves into it, there was an explanation during the criminal trial about what the lockdown means. And Corporal Hewling, the officer who's kind of in charge of the scene, who ultimately restricts Miss Gowdy's exit from the vestibule on the video, he testifies that it's a soft lockdown. It's not a hard lockdown. And what that means for him is if he is able to identify that there is a person who is related to the gunshot wound incident, that person is restricted from visiting. He's not going to restrict patients. He's not even going to restrict all visitors. That's why the My Girl's In Here guy gets in later. But what the video shows is at the point that Miss King is denied entry to the hospital. It's because officers have reason to believe that she is now related to the gunshot wound incident. On video, minutes before Miss Gowdy and Miss King approach the hospital entrance, they announce on audio. You can hear it. I'm going in to do something about this. At that point, a reasonable officer can perceive that this isn't just Miss King wanting to accompany Miss Gowdy into the hospital to assist with getting her belongings or her laboratory results. A reasonable officer. But I guess I'm not following this. I'm going to do something about this. Why can't that just be they're angry that the father's being denied entrance? And they're allowed to be angry. And they're allowed to express that as part of a First Amendment right. But an officer acting reasonably while enforcing a soft lockdown can also reasonably believe that that may be going in to somehow make the internal scene worse or cause chaos inside. And that's the point that the officers exercise their discretion to say, all right, we can't deny Miss Gowdy entrance because she is a patient. But at this point, we can and should deny Miss King entrance. And so the real question here is are they acting reasonably within their discretion to do so in enforcing that soft lockdown? So that is not only showing that there's not retaliation for her First Amendment conduct. But at a minimum, there is certainly no case law that plaintiffs have identified or opponents have identified here showing that it was clearly established that officers cannot control a soft lockdown in that manner. We have an analysis from the district court on count one specifically. Your opponent started with count one. You know, one reading. You can tell me if I'm wrong or this is incorrect of the district court's opinion. Is it kind of collapsed counts one through three and didn't really talk specifically about count one period. And the reason why it gets to an initial argument from our briefs, which is when this case was presented, count one comes together with the rest of them, all seeming to challenge the initial not only exclusion, but the arrest and charge. When this case was originally filed before Judge Polster, Paris King was actually a party to it. I understand. I get that it's so at the time that it was briefed on the motion for judgment on the pleadings. Our understanding was that count one was challenging effectively making a collateral challenge against Miss King's arrest. So we briefed this entirely as a Neves case and said probable cause ultimately shows there's no retaliation. And that's the basis here. Appellants had the opportunity to say that's wrong and to say that count one is actually a pre arrest retaliation claim in their briefs. They never did it. They didn't even comment on Neves. Let's assume I don't think they waived it or anything like that. So how should we approach count one if we don't have an analysis really on the constitutional piece? Should we just go to clearly established? So forfeiture aside, I think there's two ways to approach it. The first way is to actually say that Neves is the correct analysis for that because ultimately when you look at the video, there is no daylight between the moment that the officers say you can't come in. And the moment that this escalates into a situation where they're arresting her for disorderly conduct. So I actually don't think the court was wrong to approach it as a Neves issue. But if you were to agree with opposing counsel here that this is a pre arrest retaliation claim, that you can somehow mark the difference between those two moments. Then we're talking about the Mount Healthy Framework. The what? The Mount Healthy Framework. And that requires a substantial connection between the speech and the act of retaliation. Our view is that the video, both the denial of the father and the comment of the I'm going in to do something about this, blatantly contradicts the allegation that there is a substantial connection between the act of speech and the ultimate exclusion and subsequent arrest. I do want to speak for just a moment about the remaining counts. I know this court didn't get into them before Mr. Patakos' argument. But in terms of the extent to which the video blatantly contradicts the no probable cause allegations as to Ms. Gowdy. I think the video, when you get into the charge of obstructing official business. There's no real dispute here that the officers were enforcing this soft lockdown, enforcing the visitor restrictions as part of their lawful duty to do so as police officers on the scene. It really comes down to is there an affirmative act here that obstructs, prevents, or delays the officers' control of that scene? Ultimately, we think the affirmative act shown here is the linking of hands after the officers have already told Ms. King you can't come in. Ms. Gowdy reaches out for her daughter, takes her hand, attempts to bring her in at that point in violation of the officers' instructions and control of the scene. As for the elements of the disorderly conduct charge, we think that there's certainly enough there to say that it was hindering or preventing movement, as is the element under Ohio law. So there's a bit of an obstruction there of the entrance, and we think that negates the no probable cause allegations of this scene. If your honors have no further questions, I'm happy to see the remainder of my time to my colleague Mr. Oman from the city of Cleveland. I think we're fine. Thank you. Good morning. Good morning. Thank you, your honors. I'm Matthew Oman for Appellee City Cleveland. May it please the court. The operative complaint brought two counts against the city of Cleveland. District court granted judgment to Cleveland on a Rule 12c motion on both those counts. Now before you on this appeal, Ms. Gowdy has made no claims or argued that those counts should be reinstated here. Manel isn't used in Ms. Gowdy's brief, in her opening brief, or in her reply brief. So in our view, these arguments have been waived and this court should affirm. All right. Thank you. Appreciate it. Okay, we'll hear rebuttal. Thank you again. I'd like to start by addressing what I believe is a startling argument that Mr. Ruedinger has made, including what he emphasized in his argument here, which is that a mother taking her daughter's hand to go back into the hospital where the two of them have been for hours to receive emergency medical care is a crime, or even probable cause for a crime. And you can just look, the court may just look at what these criminal statutes under which Ms. Gowdy was prosecuted actually say, disorderly conduct, no person shall, and the only prong of the disorderly conduct statute that is at issue in this case is 291711A. No person shall, first, recklessly cause inconvenience, annoyance, or alarm by engaging in violent or turbulent behavior. That's what they have to show. A mother taking her daughter's hand to go into the hospital, come on, honey, this is crazy, let's just go. What she was actually showing was they wanted to just walk away. Arguably, leaving Ms. King there would have been more of a disturbance. They just wanted to get back to, there was testimony at trial that they were sitting in the waiting room for hours just scrolling their phones, which is very easy to see. They were actually de-escalating to say that that could be any probable cause. I think it's frankly a bit dystopian. And then looking at the obstructing official business statute, one within this is revised code 292131A, an act done without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity. That hampers or impedes a public official in the performance of the public official's lawful duties. What in the world was being obstructed here? These officers at the scene didn't say a word about a soft lockdown. There was nobody said lockdown, nobody said, hey, there's a gunshot wound victim that just came in, that's why we can't let you in. Had they done that, this might have been a different case. Had they said, I'm sorry, Ms. King, you know, we just had a gunshot wound victim come in. They had no visitors now, did they not, at one point? Maybe at one point, but not when they abruptly just said, you can't come in, ma'am. In the heat of this argument that the officers... If at any point an officer says, you can't go here, there are clearly guards at the hospital, you're entitled to completely disregard that and say, you know, I'm going in. I'm not going that far at all, Your Honor. I mean, counsel, you know, words are mobile, but isn't that turbulence? You know, if I'm starting to cross the street and for whatever reason the officer says, don't cross the street right now, maybe a traffic accident, maybe something, I don't know. But if the officer says, don't cross the street, am I not being turbulent if I say, blank, I'm going to go across the street? Maybe, but that's a very different case. I think that in this context, so we did point out in our briefing that it's an issue of fact as to whether Ms. Gowdy even processed or heard the officer say that. She said, this is my daughter. She said, this is my daughter. Again, it's a traumatizing experience. It's hard enough to be at the hospital to seek emergency medical care and then to witness this event and then to have the officers harassing you to get in the door and then to tell you that now you're getting split up from your daughter while you're waiting for test results on a medical issue that you're genuinely worried about. So there are issues of fact there. And I think that Ms. Gowdy had the right to say to these officers, hey, come on, this is my daughter, please, that this can be interpreted in that way. So I do think that defeats the probable cause analysis. And I would just like to emphasize in my remaining moments here. Mr. Rootinger just emphasized how much of this is just issues of fact. He's just asking this court to affirm the resolution of disputed issues of fact in his favor. Officers have reason to believe that Paris King is related to a gunshot victim. That is clearly an issue of fact. He is asking for police officers to have completely unlimited discretion. And I was reflecting on Judge Sutton admonishing me, Chief Judge Sutton admonishing me for getting emotional, which is fair. But frankly, it is upsetting to think that a citizen who went through what Ms. Gowdy did would not have a remedy under 1983 here. So I am genuinely upset about it. And I hope that on reflection this court will be as well and will reverse. Thank you. All right, thanks to all three of you for your briefs and arguments and for answering our questions, which we always appreciate. Thank you so much. The case will be submitted and the clerk may adjourn the court.